**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **AMY HAMM, on behalf of herself and all others similarly situated,** | § § § | **Case No. 3:21-cv-00550** |
| *Plaintiff,* | § § | |
| **v.** | § § | **District Judge William L. Campbell, Jr.** |
| | § | **Magistrate Judge Jeffrey S. Frensley** |
| **ACADIA HEALTHCARE CO., INC., and ACADIA MANAGEMENT COMPANY, LLC,** | § § § § | |
| *Defendants.* | § § | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
DISTRIBUTION OF NOTICE PURSUANT TO 29 U.S.C. § 216(b)**

This is a Fair Labor Standards Act ("FLSA") unpaid overtime case. Plaintiff Amy Hamm ("Plaintiff") seeks to distribute Court-authorized notice to a collective of similarly situated patient-care employees, such as Registered Nurses ("RNs"), Mental Health Technicians ("MHTs"), and Behavioral Health Associates ("BHAs") employed by Defendant Acadia Healthcare Co., Inc.'s ("AHC") and Acadia Management Company, LLC's ("AMC") ("Defendants" or "Acadia"). Plaintiff requests this Court issue notice to ensure other hourly-paid patient employees may join this action and stop the running of their statute of limitations. Specifically, Plaintiff requests this Court issue court-authorized notice to the following:

> All current and former hourly, non-exempt employees involved with
> patient care, including but not limited to nursing staff, nurses,
> nursing assistants, nurse aides, technicians, clerks, non-exempt

1

therapists, or other non-exempt employees with similar job duties employed at any facility owned and/or operated by Defendants from July 27, 2018 until resolution of this action (the "Collective").

Courts in this Circuit follow the two-step approach to sending court-authorized FLSA notice. The first step requires the plaintiff to request the distribution of notice and present a "strong likelihood" that she is similarly situated to the proposed collective members. The second step occurs after notice is distributed and collective discovery is finished. Courts then employ a stricter standard to determine conclusively whether the named plaintiffs are in fact similarly situated to the opt-in plaintiffs. *Teran v. Lawn Enf't, Inc.*, 2023 WL 4948009, at *2 (W.D. Tenn. Aug. 1, 2023).

Plaintiff satisfied this step 1 burden. The evidence shows that that she and the proposed collective members all: (1) performed similar job duties; (2) were subject to the same patient care, compensation, overtime, and unpaid meal period policies; (3) worked unpaid overtime hours without proper overtime pay; (4) have a similar duty of care to patients (ethically, legally, and pursuant to Acadia's policies and expectations); and (5) were subject to similar staffing practices. They also were required and/or expected to work "off the clock" before and/or after shifts. Accordingly, Plaintiff requests this Court distribute notice in the manner described below.

## I.    FACTS[1]

### A.    The Parties and Claims.

Plaintiff worked for Acadia as a nurse across multiple locations and states, including Texas and Louisiana.[2] Ms. Hamm alleges that she and Acadia's other patient-care employees were not paid for time they were required to remain on-duty and subject to interruption during unpaid meal breaks, or when their breaks were in fact interrupted. Acadia owns, operates, and/or manages

---

[1] Unless otherwise noted, all references to page numbers of electronic filings refer to those generated by the Court's ECF system.

[2] First Am. Compl. (ECF No. 94) at ¶¶ 31-32.

several hundred hospitals and healthcare facilities throughout the United States.[3] Acadia employs thousands of hourly-paid, non-exempt patient care workers across this network of healthcare facilities.[4] Plaintiff and putative collective members are hourly-paid direct patient care employees, such as a Registered Nurses ("RNs"), Mental Health Technicians ("MHTs")/Behavioral Health Associates ("BHAs"),[5] and non-exempt therapists.[6]

It is important to note that Acadia owns and operates **mental-health** facilities. The nature of these facilities, combined with Defendants' mandate that collective members avoid patent abuse or neglect (defined by Acadia as anything that fails to provide for the patient's basic needs or in any way endangers a patient's emotional or physical well-being)[7] at all costs, all creates an environment where patient-care staff must remain alert and vigilant to assist with patient care needs, evening during unpaid meal periods.[8] These are places where patients are dealing with

---

[3] *See* Fed. R. Civ. P. 30(b)(6) Deposition of Acadia Management ("Holdstock Dep."), attached as **Exhibit 1,** at 57:1-9.

[4] First Am. Compl. (ECF No. 94) at ¶ 44. *See also* Fed. R. Civ. P. 30(b)(6) Deposition of Acadia Healthcare Company, Inc. ("Acadia Dep.") attached as **Exhibit 2**, at 28:15-29:6, (explaining the oversight of "facility execution, so what the subsidiaries are each doing in service to the communities that they serve.")

[5] MHTs and BHAs are the same position, and the terms are used interchangeably. Holdstock Dep. at 87:16-88:2.

[6] First Am. Compl. (ECF No. 94) at 46; Holdstock Dep. at 55:19-56:23.

[7] (ECF No. 58-4) at 19. *See also* Compliance & Code of Conduct Webpages, attached as **Exhibit 3.** ("**It is expected of all Acadia Healthcare affiliates** whether contracted, credentialed or employed, to **be alert and sensitive to situations that could result in improper, unethical or illegal conduct**. Each Acadia Healthcare affiliated individual has an obligation and responsibility for reporting any activity by an employee, physician, board member, contractor or a vendor that appears to violate applicable laws, rules, and regulations or our Code of Conduct.")

[8] Declaration of Amy Hamm ("Hamm Decl.") (ECF No. 58-3) at ¶ 12 ("As a patient care employee, I, and the other patient-care staff, have ethical obligations to our patients that we cannot simply ignore. Acadia also has company policies that track and emphasis these ethical obligations. For example, if a patient has an emergency we are ethically obligated to assist immediately and cannot simply wait to finish my break before helping. If I failed to respond to patients in need of aid, this could be considered patient neglect and subject me to discipline."); Declaration of Clarisse Casalino ("Casalino Decl.") at ¶ 7; ("I (and others) often couldn't step away to take an uninterrupted break because I was too occupied with getting necessary patient paperwork done (such as incident reports that must be completed when, for example, a patient attacks someone or harms themselves), responding to codes, and dealing with patient trying to harm themselves or

3

mental health crises, "[w]hether that be just, for example, like a manic episode or a suicidal ideation, homicidal ideation, things like that."[9] Patients not only try to harm themselves, but also harm other patients and staff members, and try to escape. [10] For example, Opt-in Plaintiff Casalino detailed an instance in which she was attacked by a patient (a common experience at Acadia's facilities.)[11] Many patients also are "having paranoid delusions or [] are going through substance abuse withdrawal/detox," and others are on 24/7 suicide watch.[12]

Defendant Acadia Management Company, LLC is the management arm of the Acadia Healthcare umbrella. It is a wholly owned subsidiary of Acadia Healthcare Company, Inc., and oversees the facilities where Ms. Hamm and putative collective members worked.[13] It establishes and sets the common policies and standards that Defendants impose on all putative collective members. For example, Acadia Management Company, LLC maintains the human resources

others."); Declaration of Kamara Holmes ("Holmes Decl.") at ¶ 7 ("For example, during my breaks, I (and other nurses) was responding to codes, completing necessary paperwork, assisting with medication administration, updating providers/physicians, and completing incident reports. Incidents reports are used for a variety of things, such as when a patient tries to harm themselves, another patient, or a staff member. We often had to complete incident reports given that we worked in a mental health facility."); Declaration of Thomas Proctor ("Proctor Decl.") at Proctor Decl. at ¶ 6 ("I was often called back on the floor to respond to a patient code when I attempted an unpaid meal break."); Declaration of Claudia Ramirez ("Ramirez Decl.") at ¶ 6 ("This meant that I had to respond to codes that happened on my shift, even if I was trying to take a meal break."); Declaration of Rance Clark ("Clark Decl.") at ¶ 6 ("I also was not allowed to decline to assist if a patient, doctor, or other hospital personnel asked for my help, even during my unpaid meal breaks."), collectively attached as **Exhibits 4-8.**

[9] Holdstock Dep. at 57:23 – 59:2. *See also*; Holmes Decl. at ¶ 7 ("Our patient population is made up of people who are in acute need of behavioral or psychiatric services, such as individuals having paranoid delusions or that are going through substance abuse withdrawal/detox (who were often brought to the facility by other people, and were not happy to be there). This makes work in a mental health facility unpredictable, which in large part contributed to working during my unpaid meal breaks. People having paranoid delusions, for example, do not wait for my meal break to be over before they have an episode."); Proctor Decl. at ¶ 9; Ramirez Decl. at ¶¶ 5-6; Clark Decl. at ¶ 5 (explaining patients classified as suicide risk); Casalino Decl. at ¶ 14.

[10] Holdstock Dep. at 99:2-8.

[11] Casalino Decl. at ¶ 14.

[12] Holmes Decl. at ¶¶ 7-8, Casalino Decl. at ¶ 7; Proctor Decl. at ¶ 9; Ramirez Decl. at ¶ 6; Clark Decl. at ¶ 5.

[13] Acadia Dep. at 11:2-11, 223:5-11.

4

information system for each of the facilities where Plaintiff and the putative class worked; (b) reviews and approves the facilities' payroll; (c) provides legal support and guidance to these same facilities; and (d) employes the CEOs and CFOs at the facilities where Plaintiff and putative collective member worked.[14]

Acadia employs a uniform policy/practice of requiring non-exempt workers, like Plaintiff, to continue to work during their unpaid 30-minute meal breaks.[15] Acadia requires that these workers manually clock out for their meal break.[16] Yet Acadia requires these workers to remain on-duty, subject to interruption, and at all times engaged and vigilant for their patients' needs during these unpaid breaks.[17] Yet they are required to remain attentive and responsive to any patient care needs that might arise during that "break" time. Defendants' policies provide that: "Patient neglect is prohibited . . . **Failing to be fully engaged** in promoting patient treatment plans **would also be considered to be neglect**."[18] However, Acadia's common overtime policy requires overtime to be "pre-approved", and specifically states that "hourly employees who worked unauthorized overtime **will be subject to disciplinary action up to and including**

---

[14] Holdstock Dep. at 30:5-22, 41:16-42:24, 46:25-47:13, 52:13-53:24, 80:1-9.

[15] *See id*; Acadia Dep. at 126:7-16; Acadia Employee Handbook & 2019 Revision (ECF No. 58-4) at Hamm_Red_River_000242; Acadia Policy No. HR-320, "Rest and Meal Breaks" (ECF No. 58-5) at Hamm_Red_River_000209-210.

[16] *See id.*

[17] Hamm Decl. at ¶¶ 12-13; Holmes Decl. at ¶¶ 6, 9-10; Casalino Decl. at ¶¶ 7-9, 14; Proctor Decl. at ¶¶ 8-9; Ramirez Decl. at ¶¶ 5-6; Clark Decl. at ¶¶ 5-7. Acadia's Code of Conduct (ECF No. 58-6) at Hamm_Ochsner-Acadia_000216 (instructing all employees to remain "alert and sensitive to situations that could result in improper, unethical or illegal conduct[,]" and directing that every Acadia affiliated employee is to abide by their ethical duties and report any potential ethical, legal, regulatory, or other violations to the compliance officer); *see also* Acadia Dep. at 205:17-23 (same Code of Conduct for all facilities); Holdstock Dep. at 64:10-11 ("A. We would expect employees to comply with the Code of Conduct.")

[18] Patient Abuse and Neglect Policy (ECF No. 58-7) at Hamm_Ochsner-Acadia_000233 (emphasis added). *See also* Hamm Decl. ¶ 12; Holmes Decl. at ¶ 5; Casalino Decl. at ¶ 5; Proctor Decl. at ¶¶ 6-8; Ramirez Decl. at ¶¶ 4-5; Clark Decl. at ¶ 6; Acadia Dep. at 121:2-11 ("Q. And the second bullet point discusses neglect. Do you see that? A. Yep. **Q. And this is Acadia Healthcare's expectation as to all facility employees as it relates to neglect of the patients, correct? A. That's my understanding, yes.**")

**termination**."[19] But Acadia recognizes that situations arise where employees will be forced to work though meal breaks.[20] Thus, these employees are all subject to Acadia's uniform timekeeping, meal and rest break, overtime, and Code of Conduct policies.[21]

As direct patient care workers, they are also subject to the same important ethical responsibilities and obligations for their assigned patients.[22] These ethical responsibilities are manifested in Acadia's employment policies, which mandate that they remain fully engaged in promoting patient treatment, and prohibit "failing to provide for the patient's basic needs or failing in [their] duties in any way that would endanger [a] patient's emotional or physical well-being."[23] These obligations also comport with common sense: it would be outrageous for a patient care employee to refuse to assist a patient trying to harm themselves because they have not finished their lunch.

These policies place Plaintiff and the putative collective members in a conundrum. On one hand, putative collective members are required to suffer unpaid meal breaks, and/or remain on-duty during those meal breaks to comply with Acadia's written patient care and neglect policies. On the other hand, they are subject to automatic discipline, up to and including termination, for working unapproved overtime. These workers are therefore faced with an impossible choice:

---

[19] Acadia Policy No. HR-305, "Overtime" (ECF No. 58-8) at Hamm_Red_River_000222; *See also* Acadia Dep. at 156:8-12 ("Q. And if you are made aware of -- if Acadia is made aware of the unauthorized overtime, I understand [you claim that] they'll pay it, but then the employee is also subject to discipline, correct? A.· Yes. Potentially.").

[20] Acadia Dep. at 144:25-145:2 ("Q. Acadia recognizes that interruptions of meal breaks occur, correct? A. Yes.")

[21] Acadia Dep. at 125:3-19 (explaining uniform overtime and meal break policies/expectations); *see also id.* at 126:13-19 ("A. Yeah. We'd be asking them to give people meal breaks based on these guidelines."); Holdstock Dep. 64:10-11 ("A. We would expect employees to comply with the Code of Conduct."); Hamm Decl. ¶¶ 6-8, 12; Holmes Decl. at ¶¶ 2-7, 11; Casalino Decl. at ¶¶ 6-15; Proctor Decl. at ¶¶ 5-10; Ramirez Decl. at ¶ 4; Clark Decl. at ¶¶ 5-6.

[22] Hamm Decl. ¶¶ 12; Holmes Decl. at ¶¶ 5-6; Casalino Decl. at ¶¶ 11-13, 14; Proctor Decl. at ¶¶ 6-8; Ramirez Decl. at ¶ 4; Clark Decl. at ¶¶ 5-6.

[23] (ECF No. 58-4) at 19.

refuse to come out of their breaks and risk a finding of patient neglect (resulting in termination), or remain on-duty, report the missed meal break, and risk losing their job.

In addition to this unlawful meal break scheme, *see* 29 C.F.R. § 785.19, Acadia encourages its workers to arrive early for their shifts to start work early, but disallows them from clocking in until a narrow window before their scheduled start times.[24] Acadia also expects its workers to clock out within a short window of time from their scheduled end-of-day, but requires them to continue working after clocking out to finish various activities, including charting and assisting with patient care, while off-the-clock.[25]

## II.    STANDARD OF REVIEW

The FLSA allows "any one or more employees" to assert a claim for unpaid overtime, either individually or also on behalf of any other employees who are "similarly situated." 29 U.S.C. § 216(b). But, unlike class actions, "plaintiffs in an FLSA action must affirmatively choose to become parties by opting into the collective action." *Canaday v. Anthem Companies, Inc.*, 9 F.4th 392, 402 (6th Cir. 2021) (cleaned up). Given this opt-in requirement, FLSA collective actions generally proceed in two stages: the initial notice stage and the post-discovery stage. *See Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1017 (6th Cir. 2023) (White, J., concurring in part) ("[T]he advantages of a two-step framework remain, and today's ruling still supports a two-step approach by contemplating notice before a final similarity determination."); *McElwee v. Bryan Cowdery, Inc.*, 2023 WL 4423880, at *11 (S.D. Ohio July 10, 2023; ("[T]he Sixth Circuit retained a two-step process for issuing notice and allowing FLSA claims to proceed as a collective action."); *McCall v. Soft-Lite L.L.C.*, No. 5:22-CV-816, 2023 WL 4904023, at *5 (N.D. Ohio Aug.

---

[24] Hamm Decl. at ¶¶ 16-19; Casalino Decl. at ¶¶ 15-16; Proctor Decl. at ¶¶ 11-14; Ramirez Decl. at ¶¶ 7-12; Clark Decl. at ¶¶ 9-15.
[25] *Id.*

7

1, 2023) (describing the "post-Clark two-step process"). The purpose of the first stage is to give notice to potential plaintiffs and provide them with an opportunity to join the case. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013); *Clark*, 68 F.4th at 1009; *McElwee*, 2023 WL 4423880, at *11. This determination is provisional. Later, at the post-discovery stage, the court employs a stricter standard to determine conclusively whether the named plaintiffs are in fact similarly situated to the opt-in plaintiffs. *Teran*, 2023 WL 4948009, at *2.

## III.    ARGUMENT

The evidence here demonstrates a strong likelihood that putative collective members worked for the same entities, performed similar duties, and were paid similarly across the country. This satisfies Plaintiff's step-one burden. *See Clark*, 68 F.4th at 1010 (similarly situated status for notice purposes "typically depends on whether they performed the same tasks and were subject to the same [timekeeping and compensation] policies. . .") (citing *Pierce v. Wyndham Resorts, Inc.*, 922 F.3d 741, 745–46 (6th Cir. 2019)). At this notice stage, Plaintiff need only demonstrate a "**strong likelihood**" that she is similarly situated to the other employees she seeks to notify. *Clark*, 68 F.4th at 1011; *Teran*, 2023 WL 4948009, at *2 (emphasis added). This is akin to the preliminary injunction standard: more than a possibility of success is required, but less than a certainty of success. *Clark*, 68 F.4th at 1010–11. And Plaintiff is only required to show that her position is **similar** to the positions held by the putative class members—not identical. *Clark*, 68 F.4th at 1020 (White, J., concurring in part) (reminding district courts that the Court's ruling "does not address the underlying threshold for FLSA similarity, which remains the same . . . 'similar, not identical'"). Further, this initial determination as to whether putative plaintiffs are similarly situated to the named Plaintiff is merely provisional. *Id.* at 1010–1; *see also McElroy v. Fresh Mark, Inc.*, No. 5:22-CV-287, 2023 WL 4904065, at *6 (N.D. Ohio Aug. 1, 2023).

8

Importantly, while the "strong likelihood" standard may, at first glance, seem to place a higher burden on plaintiffs when compared to the prior "fairly lenient" standard, it **does not** in practice. *Clark*, 68 F.4th at 1020 (White, J., concurring in part) (*Clark's* holding "does not mean the standard is necessarily higher than all prior applications of the earlier standard . . . ."); *see also Rashad v. Mason's Pro. Cleaning Serv.*, *LLC*, 2023 WL 5154534, at *2 (W.D. Tenn. Aug. 10, 2023) (emphasis added) ("**The Court does not believe that *Clark* changed the general understanding that '[a] court can conditionally certify a collective action under the FLSA on the strength of a single affidavit or declaration**" alone.) The *Teran* court addressed this exact issue: the court granted conditional certification under the prior *Lusardi* standard; following *Clark*, the defendant moved for reconsideration. *Teran*, 2023 WL 4948009, at *1. The court denied the defendant's motion, "because the Plaintiffs have demonstrated a strong likelihood that the potential opt-in plaintiffs are sufficiently similarly situated to Plaintiffs." *Id.* at *3. The court relied on the same evidence that was previously before the court; namely, the amended complaint, which provided details on the experiences of eight individual plaintiffs, and a declaration from one individual who worked in a management position and stated that others were subject to the same policies. *Id.* Based on that evidence, the court concluded "there is a strong likelihood that additional employees were subject to similar illegal pay practices of Defendants." *Id.*

Here, the evidence far surpasses the "strong likelihood" standard. The allegations in the First Amended Complaint, 6 declarations, sworn deposition testimony, and extensive documentary evidence, shows that Defendants' hourly-paid patient-care employees are sufficiently similarly situated for notice to issue. *See Teran*, 2023 WL 4948009, at *2.

A.    Acadia's Hourly-Paid Patient Care Employees Perform Similar Duties.

Plaintiff and the putative collective members are all non-exempt workers and have the same primary job duty: providing direct patient care services in a mental health environment while

emphasizing patient safety.[26] Nurses are responsible for various aspects of direct patient care, such as medication administration, patient assessments, ensuring admissions and discharges are completed safely and efficiently, and other patient care tasks. [27]At the end of the day, the nurses' job duties are focused on ensuring patient safety.[28] BHAs serve a complimentary role to the nurses, performing tasks such as observing patients to ensure they were not harming themselves or others.[29] They also assisted with other tasks such as changing patient's bedding, assisting with nutrition and medications, and helping soothe agitated patients.[30] As with nurses and other patient care staff, the BHAs' job duties were centered around patient safety.[31] Plaintiff and putative collective members are also required to abide by ethical codes and policies that obligate them to attend to any patient care needs that might arise during any alleged "break" time.[32] None of these core job duties vary from facility to facility or from unit to unit.[33]

The fact that Plaintiff and putative collective members worked in a mental health facility is crucial. As AMC's corporative representative explained, patients are experiencing "acute mental

---

[26] Holdstock Dep. at 36:1-3 ("Q. Anyone at the facility level should want to prioritize patient safety; right? A Yes."); id. at 48:14-21 ("Q. Okay. Like we talked about it earlier, patient safety is a priority at the facility level; correct? A. Yes. Q. And so patient care employees should always act urgently when it comes to patient safety; right? A. Yes.).

[27] Acadia's RN Job Description at Hamm_Red_River_000017, attached as **Exhibit 9**; Acadia's LPN-LVN Job Description at Hamm_Red_River_000013, attached as **Exhibit 10**; Holdstock Dep. at 107:12-23.

[28] Holdstock Dep. at 36:1-3; 48:18-21.

[29] Acadia BHA Job Description at Hamm_Red_River_000001, attached hereto as **Exhibit 11**; Holdstock Dep. at 90:10-13.

[30] *Id.*

[31] Holdstock Dep. at 36:1-3; 48:18-21.

[32] First Am. Compl. (ECF No. 94) at ¶¶ 26-29. *See also* Patient Abuse and Neglect Policy (ECF No. 58-7) ("Patient neglect is prohibited. . . . **Failing to be fully engaged** in promoting patient treatment plans **would also be considered to be neglect**." (emphasis added)); Holdstock Dep. at 141:13-143:3 (explaining that Acadia expects its patient care employees to respond in emergency circumstances, even if during a meal period).

[33] *See id.* at 90:14-94:3; 107:17-23; see also Holdstock Dep. at 107:7-109:24; see also Hamm Decl. at ¶¶ 5, 12; Holmes Decl. at ¶¶ 3-5; Casalino Decl. at ¶¶ 4, 6, 12; Proctor Decl. at ¶¶ 3, 5, 7; Ramirez Decl. at ¶¶ 3-4; Clark Decl. at ¶¶ 4-6.

health cris[es]" such as "a manic episode or a suicidal ideation, homicidal ideation, things like that."[34] Others are struggling with substance abuse and withdrawal.[35] Patient care staff therefore must constantly remain cognizant of patients trying to escape, or harm themselves or others.[36] Thus, all patient care employees must remain vigilant to patients harming themselves, patients harming other patients, and patients harming staff.[37] This universal reality is reflected in the De-Escalation/Restraint Certification that Defendants require **all** patient care-employees to possess.[38] This is further memorialized in Defendants' handbook which explains that patient neglect – defined as failing to provide for the patient's basic needs or failing in **any way that would endanger a patient's emotional and physical well-being** – is a basis for discipline.[39] Putative class members would be disciplined for failing to prioritize patient safety over any other obligations.[40] Thus, all patient care employees are expected to act urgently (and remain available to act) when it comes to patient safety, and that means preventing harm when it can be prevented, even during a meal "break."[41] These core duties are what matters for present purposes, and notice can issue "even though how those duties are handled on a day-to-day basis and the amount of time

---

[34] Holdstock Dep. at 57:21-58:23. *See also* Holmes Decl. at ¶¶ 7-8; Casalino Decl. at ¶ 14; Proctor Decl. at ¶ 9; Ramirez Decl. at ¶ 6; Clark Decl. at ¶ 5.

[35] Holdstock Dep. at 58:7-11. *See also* Holmes Decl. at ¶¶ 7-8; Casalino Decl. at ¶ 14; Proctor Decl. at ¶ 9; Ramirez Decl. at ¶ 6; Clark Decl. at ¶ 5.

[36] Holdstock Dep. at 98:24-99:22. *See also* Holmes Decl. at ¶¶7-8; Casalino Decl. at ¶ 14; Proctor Decl. at ¶ 9; Ramirez Decl. at ¶ 6; Clark Decl. at ¶ 5.

[37] *See id. See also* BHA Job Description ("Assist in providing a safe, secure and comfortable environment for patients . . ."); RN Job Description.

[38] BHA Job Description and RN Job Description (requiring RNs, BHAs/MHTs, and LPNs/LVNs to have "de-escalation and restraint certification.")

[39] (ECF No. 58-4) at 19.

[40] Patient Abuse and Neglect Policy (ECF No. 58-7) (explain patient abuse or neglect is a violation of Acadia's code of conduct and will result in immediate termination).

[41] Holdstock Dep. at 101:19-102:4, 141:13-143:3; Acadia Code of Conduct (ECF No. 58-6) at Hamm_Ochsner-Acadia_000216 (instructing all employees to remain "alert and sensitive to situations that could result in improper, unethical or illegal conduct[,]" and directing that every Acadia affiliated employee is to abide by their ethical duties and report any potential ethical, legal, regulatory, or other violations to the compliance officer); *see generally* Exs. 4-8 (declarations); *see also* Acadia Dep. at 205:17-23 (same Code of Conduct for all facilities).

spent on those duties can vary." *Rakowsky v. Fed. Express Corp.*, No. 23-cv-02340-TLP-tmp, 2024 U.S. Dist. LEXIS 177365, at *7 (W.D. Tenn. Sep. 30, 2024). Plaintiff and putative collective members are therefore similarly situated for purposes of 28 U.S.C. § 216(b) notice.

B.    <u>Plaintiff and Putative Collective Members are all Compensated in the Same Fashion and Work Overtime.</u>

There is no real dispute that Defendants paid Plaintiff and the putative collective by the hour.[42] It is also clear that they all similarly work more than forty (40) hours per week and are subject to the same overtime policy.[43] Hourly-paid patient care employees all use the same time keeping system and must comply with the same timekeeping policies and procedures.[44] These facts support issuing notice. *See Clark*, 68 F.4th at 1010 (employees are subject to the same timekeeping and compensation policies are likely similarly situated).

C.    <u>Plaintiff and the Putative Collective Members are Subject to the Same Relevant Employment Policies and Procedures.</u>

Plaintiff and putative collective members are all subject to Defendants' patient care, timekeeping, and meal break, and overtime policies, such as HR-245 (Patient Abuse and Neglect),[45] HR-315 (Recording Working Time),[46] the "Acadia Healthcare Employee Handbook"[47]

---

[42] See Exs. 9-11 Job Descriptions (noting that RNs, LPNs/LVNs, and BHAs/MHTs are all "non-exempt" employees); *See generally* Exs. 4-8 (declarations); First Am. Compl.

[43] HR-305 OT Policy (ECF No. 58-8). Holdstock Dep. 133:19-21.

[44] *Id. See also* Acadia Dep. at 45:19-24.

[45] (ECF No. 58-7); Holdstock Dep. at 70:18-23; *id*. at 68:7-9 ("A. Every facility should have a policy that strictly prohibits patient abuse and neglect, yes."). *See also* Acadia Dep. at 121:5-11 ("Q. And the second bullet point discusses neglect. Do you see that? A. Yep. Q. And this is Acadia Healthcare's expectation as to all facility employees as it relates to neglect of the patients, correct? A. That's my understanding, yes."); Hamm Decl. at ¶¶ 6-7; Holmes Decl. at ¶ 5; Casalino Decl. at ¶ 6; Ramirez Decl. at ¶¶ 4-5; Proctor Decl. at ¶¶ 5-6; Clark Decl. at ¶¶ 4-5.

[46] HR-315, Recording Working Time, attached as **Exhibit 12**; Acadia Dep. at 125:3-19 (explaining a uniform overtime and meal break policies/expectations); id. at 126:18-19 ("A. Yeah. We'd be asking them to give people ·meal breaks based on these guidelines."); *id.* at Acadia Dep. 98:5-19, 154:21-155:20 (uniform payroll and record keeping).

[47] (ECF No. 58-4); Acadia Dep. at 101:12-16 (explaining same Acadia handbook is given to the facilities); Hamm Decl. at ¶¶ 6-7; Holmes Decl. at ¶ 5; Casalino Decl. at ¶ 6; Ramirez Decl. at ¶¶ 4-5; Proctor Decl. at ¶¶ 5-6; Clark Decl. at ¶¶ 4-5.

12

and the "Acadia Healthcare Code of Conduct."[48] Other common policies applicable to the putative

collective members include HR-310 (Pay Periods and Pay Statements),[49] HR-305 (Overtime),[50]

and HR-320 (Rest and Meal Breaks).[51] In addition, all patient care workers utilize the same

electronic timekeeping system, UltiPro.[52]

> D. The Putative Collective Members Share a Common Duty of Care and are
> Required to Prioritize Patient Safety as to Avoid Patient Abuse and/or Neglect.

The very nature of direct patient care service justifies sending notice in this case. As direct-

patient care employees, putative collective members must abide by ethical codes and policies that

obligate them to remain on-duty during their unpaid meal breaks so that they can attend to any

patient care needs that might arise during that break time. Not only are these ethical obligations

present in Defendants' policies, but experts confirm they apply generally to all patient-care

employees. For example, Ms. Hillary Flanders, MPH, RN-BC, RRT, CLNC, is an expert in the

nursing field. A copy of her Fed. R. Civ. P. 26(a)(2)(B) Report ("Flanders' Report") submitted in

the sister case *Hamm v. Acadia Healthcare Co.*, No. 20-1515 (E.D. La.) ("the Louisiana action")

is attached hereto as **Exhibit 13**. The Flanders' Report concludes that Acadia's patient care

employees are all governed by common professional and ethical obligations, including the

American Nurses Association ("ANA") Code of Ethics for Nurses and Acadia's Patient Abuse and

Neglect Abuse and Neglect Policy. Ms. Flanders concluded that these standards impose a duty of

care that prevents healthcare professionals from turning "a blind eye to patient in need when no

---

[48](ECF No. 58-6); Holdstock Dep. at 63:17-64:11.
[49] Holdstock Dep. at 122:15-124:9.
[50] (ECF No. 58-8); Holdstock Dep. at 133:19-22; Acadia Dep. at 158:3-16.
[51] (ECF No. 58-5); Acadia Dep. 136:5-11 ("Q. This general policy applied at all the Acadia facilities, correct? A. Should be, yes, and it's part of the handbook, as we just reviewed."); Holdstock Dep. at 137:19-138:6 (reviewing HR-320 and confirming that that situations will arise where breaks are unavoidably missed or interrupted); Hamm Decl. at ¶¶ 6-7; Holmes Decl. at ¶¶ 5-6; Casalino Decl. at ¶¶ 6-7; Ramirez Decl. at ¶¶ 4-5; Proctor Decl. at ¶¶ 5-6; Clark Decl. at ¶¶ 4-5.
[52] *See* Acadia Dep. at 204:22-24.

one else is available to take care of them."[53] As she explained, this "obligation to the patient remains in effect even if an employee is on break or otherwise 'off-the-clock' per the ANA Code of Ethics for Nurses and Acadia Healthcare Policy Number HR-245 – Patient Abuse and Neglect."[54]

But putative collective members share far more in common than just ethical obligations. Defendants' Code of Conduct, which Defendants **admit** applies to all patient care workers,[55] requires class members to remain attentive and responsive to any patient care needs that might arise without distinguishing between times when workers are clocked in versus clocked out.[56] The Patient Abuse and Neglect policy likewise states: "Patient neglect is prohibited. . . . **Failing to be fully engaged** in promoting patient treatment plans **would also be considered to be neglect**."[57]

Thus, patient care workers are expected to comply with Defendants' polices (and their ethical obligations), which require that the workers remain on-call and ready to work in order to respond to emergency situations. Patient care workers cannot refuse to assist patients even if clocked out for a break. As Ms. Flanders' explained "when duty calls, it must be answered – even if an employee is on a break."[58]

  i.  *The nature of a mental health facility leads to missed breaks and renders putative collective members' meal breaks universally subject to interruption.*

The fact that Acadia operates mental health facilities is important because the nature of these facilities makes putative collective members' break inherently subject to interruption. As opt-

---

[53] Flanders Report at 5.
[54] Id.
[55] Acadia Dep. at 205:17-23 (same Code of Conduct for all facilities); Holdstock Dep. at 64:10-11 ("A. We would expect employees to comply with the Code of Conduct.")
[56] *See* (ECF No. 58-6) at 6 (instructing all employees to remain "alert and sensitive to situations that could result in improper, unethical or illegal conduct[,]" and directing that every Acadia affiliated employee is to abide by their ethical duties and report any potential ethical, legal, regulatory, or other violations to the compliance officer).
[57] (ECF No. 58-7) at 2.
[58] Flanders Report at 4.

14

in Plaintiff Clarisse Casalino explained, it "is important to remember that [we] worked at a mental-health facility, and the patient population is unstable (for example, some people are going to drug/alcohol withdrawal, other people may have paranoid delusions, and other similar diagnoses/symptoms).[59] It is common for patients to have violent outbursts, or even try to escape.[60] As noted above, Acadia thus requires all putative collective members to possess a De-Escalation/Restraint Certification for this exact reason.[61] Acadia also universally expects that their patient care employees prevent a patient harming themselves or others if they are physically able to.[62] Thus, all of Defendants' patient care employes must remain vigilant to patients harming themselves, patients harming other patients, and patients harming staff.[63]

Given the nature of the mental health facility missed breaks inevitably arise.[64] Defendants admit this.[65] These facts work together to cause putative collective members' breaks to be interrupted and otherwise make such "breaks" universally subject to interpretation. Thus, there is far more than a "strong likelihood" that Ms. Hamm and the putative collective are similarly situated; it is a near certainty.

---

[59] Casalino Decl. at ¶ 14; *See also* Holmes Decl. at ¶ 10; Holdstock Dep. at 57:3-59:2.

[60] *See id. See also* Proctor Decl. at ¶ 9.

[61] *See* RNs, BHAs/MHTs, and LPNs/LVNs Job Descriptions, Exs. 9-11 (requiring RNs, BHAs/MHTs, and LPNs/LVNs to have "de-escalation and restraint certification.")

[62] *See* (ECF No. 58-6) at 6 (instructing all employees to remain "alert and sensitive to situations that could result in improper, unethical or illegal conduct[,]" and directing that every Acadia affiliated employee is to abide by their ethical duties and report any potential ethical, legal, regulatory, or other violations to the compliance officer). *See also* Holdstock Dep. at 142:17-143:5.

[63] Holdstock Dep. at 98:24-99:22 ("Q. And we've touched on this a little bit before but just to like to make clear why the de-escalation restraint's necessary, it's because we have people that in certain circumstances that are trying to harm themselves and others; right? A. Yes. Q. Or escape from the facility, elope, for example? A. Those things occur on occasion, yes. Q. And some individuals may be having -- I don't want to sound -- I don't want to use the wrong term but maybe having like severe mental issues, right, where they're not they're not stable, for lack of a better way of putting that? . . . A. Yes. I think people with mental illness have a certain level of -- may need de-escalating from time to time.").

[64] *See generally* declarations, Exs. 4-8.

[65] Acadia Dep. at 144:25-145:2 (Q. Acadia recognizes that interruptions of meal breaks occur, correct? A. Yes."); Holdstock Dep. at 137:15-138:6.

15

E. Acadia Systemically Understaffs its Facilities, Leading to Common Wage and Hour Violations.

Plaintiff and the putative collective are also similarly situated for purposes of FLSA notice given Defendants' systemic understaffing practices. This exacerbated the inability of putative collective members to receive breaks, uninterrupted or at all. The evidence displays chronic understaffing of patient care workers at Acadia's hospitals, with patient care workers struggling to meet their patient care obligations, let alone take breaks.[66] These staffing issues lead to patient care employees working through their meal breaks, or remaining available to if needed.[67]

F. Plaintiff and Putative Collective Members Were Cheated Out of Overtime Wages in the Same Ways and for the Same Reasons.

The evidence shows that all the above-mentioned common evidence and factors ultimately lead to Defendants' hourly-paid patient care employees being cheated out of overtime wages for the reasons and in the same way. Five declarants **from across the country** confirmed that their unpaid meal breaks were interrupted, missed, or subject to interpretation due to the same reasons: a common duty of care to patients (ethically, legally, and pursuant to Acadia's policies and expectations and systemic understaffing.[68] As opt-in Plaintiff Kamara Holmes explained, it was impossible to "take an uninterrupted break because [they] were too occupied with patient care and safety. Acadia stressed the importance of patient safety, but [they]almost never had relief." This resulted in both missed and were constantly interrupted breaks.[69] This is not a unique situation or story. The evidence overwhelmingly shows patient care employees in the same situations in Acadia's facilities across the nation.[70]

---

[66] *See* Holmes Decl. at ¶ 6; Casalino at ¶ 7; Proctor Decl. at ¶ 6; Ramirez Decl. at ¶ 5; Clark Decl. at ¶¶ 4-5.
[67] See *id.*
[68] Hamm Decl. at ¶ 12; Holmes Decl. at ¶¶ 6-8; Casalino at ¶¶ 7, 11-14; Proctor Decl. at ¶¶ 6-9; Ramirez Decl. at ¶¶ 4-6; Clark Decl. at ¶¶ 5-7.
[69] Holmes Decl. at ¶ 6.
[70] *See* Holmes Decl. at ¶ 6; Casalino Decl. at ¶ 7; Proctor Decl. at ¶ 6; Ramirez Decl. at ¶ 5; Clark Decl. at ¶¶ 4-5.

16

G.    The Evidence Shows that Acadia's Patient Care Workers Perform Uncompensated Pre and Post Shift Work.

The evidence also demonstrates that Acadia encourages its non-exempt patient care workers to arrive early to prepare for their day, but not clock in until within a short window of time before their assigned start time.[71] Likewise, Acadia encourages these workers to clock out by or shortly after their scheduled end-of-day time but encourages them to stay longer and complete various duties while off-the-clock. These pre- and post-shift practices trigger Acadia's common overtime policy practice requiring preapproval), and places putative collective members in the same position they are in with their unpaid meal periods: help patients off the clock or be fired for neglect, or request compensation for working overtime that was not preapproved and face termination.

H.    Plaintiff's Evidence is Appropriate at This Stage.

Courts in this Circuit regularly authorize notice based on the type of evidence Plaintiff presented here. *Clark* in fact confirmed that evidence from employees should be credited at the notice stage. *Clark*, 68 F.4th at 1010 (recognizing that employees themselves will usually have knowledge of the relevant facts as to whether they performed the same tasks and were subject to the same policies). These is especially true where, as here, the claims involve "off the clock" work that is not ascertainable from employer records.[72]

Plaintiff presented declarations from multiple opt-in Plaintiffs (covering multiple titles and location) describing their job duties, common polices and expectations, their understanding of the

---

[71] Hamm Decl. at ¶¶ 16-19; Casalino Decl. at ¶¶ 15-16; Proctor Decl. at ¶¶ 11-14; Ramirez Decl. at ¶¶ 7-12; Clark Decl. at ¶¶ 9-15.

[72] Plaintiff sought the contact information of putative class members to investigate similar claims, yet Defendants objected and embarked on a campaign of obfuscation. *See* Joint Discovery Dispute Statement (ECF No. 103) at pp. 3-13. They claimed they did not employ any collective members, and that this information is "not determinative or relevant" to whether others similarly situated exist. This "refusal to allow discovery of documents to support the existence of a nationwide policy" means the Court should not geographically limit the scope of the collective.  *Adams v. Inter-Con Sec. Sys.*, 242 F.R.D. 530, 539 (N.D. Cal. 2007).

work performed by other hourly-paid patient care employes, multiple job descriptions, sworn Fed. R. Civ. P. 30(b)(6) testimony, expert opinion, and other evidence indicating Acadia is aware that putative collective members work more than 40 hours per week without receiving all overtime compensation.[73] She provided testimony based on her personal experiences of Defendants cheating her out of all her lawfully due overtime wages[74] and explained that other hourly-paid care workers were denied their overtime wages in the same unlawful manner. Plaintiff has first-hand knowledge that others, such as Rance Clark (nurse supervisor), Tammy Goodwin (technician), Lisa Witherspoon (registered nurse) and Michelle Santolucito (nurse) also (a) had to work though unpaid 30-minute breaks; and (b) had to work off the clock both pre and post shift. And this is further confirmed by the declarations of 4 other employees, from across the nation who likewise provided detailed accounts of how they were cheated out of wages for the same reasons and in the same ways. These declarations show that putative collective members are all (1) subject to Acadia's unpaid meal period policy; (2) share the same duty of care to patients that all class members are subject to (ethically, legally, and pursuant to Acadia's policies and expectations); (3) subject to Acadia's understaffing practices; (4) subject to Defendants' patient-care policies; (5) share common job duties that require them to work during purported meal periods; and (6) are all subject to the same Code of Conduct. This common factual and legal background lead the putative collective to accrue the same damages: unpaid wages for work done during unpaid meal periods.

This far exceeds the type of evidence that justifies the distribution of notice. *See Teran*, 2023 WL 4948009, at *2 (conditionally certifying collective where plaintiff provided a declaration

---

[73] Moreover, while Plaintiff seeks to send notice to putative collective members "company-wide," she is not subject to a higher or more burdensome standard. *See Kelly v. Bluegreen Corp.*, 256 F.R.D. 626, 631 (W.D. Wis. 2009) (plaintiffs are not "required to collect specific violations from each location or from each state before seeking authorization to provide notice to employees from all locations.")

[74] Hamm Decl. at ¶¶ 13, 15-20.

in which he asserted that defendants paid all hourly employees in the same illegal way and the complaint detailed commonalities between plaintiffs).[75] As outlined above, the Plaintiff's declarations demonstrate that putative collective members are similar in every substantively significant way: they performed the same tasks, were subject to the same patient care, timekeeping, and compensation policies, and were cheated out of overtime wages in the same fashion and for the same reasons. *Clark*, 68 F.4th at 1010. This satisfies the *Clark* standard. *Id.* (confirming that evidence from employees should be credited at this notice stage because employees themselves will usually have knowledge of the relevant facts as to whether they performed the same tasks and were subject to the same policies). Plaintiff's evidence thus addresses the core issues, as contemplated by *Clark*, and is sufficient to warrant notice. This Court should authorize notice as the evidence shows a strong likelihood that Plaintiff and putative collective members performed similar duties, were subject to similar timekeeping and payroll practices, and were cheated out of overtime wages in the same fashion and for the same reasons.[76]

I.    <u>Similar Cases Around the Country Confirm that Notice Should Issue Here.</u>

Ms. Hamm is not the first hospital employee to challenge an improper meal break policy. In fact, courts order notice sent in near identical actions against Acadia. The United States District Court for the Eastern District of Louisiana did just that in this action's sister case. *See Hamm v.*

---

[75] This type of evidence was also standard pre-Clark. *See, e.g., McGill v. Nashville Tenn. Ventures, Inc.*, No. 3:19-cv-00922, 2020 U.S. Dist. LEXIS 187064, at *7 (M.D. Tenn. Oct. 8, 2020) (J., Campbell) (conditionally certifying companywide collective action based off 5 declarations); *McKee v. Cable Tech. Commc'ns, LLC*, 2022 WL 2392572, at *2 (W.D. Tenn. July 1, 2022) (conditionally certifying collective where plaintiff submitted a declaration demonstrating that he and others employed in similar positions were all misclassified and not compensated for overtime); *Archer v. Nabors Truck Serv., Inc.*, 2018 WL 6574796, at *6 (W.D. Tenn. Oct. 12, 2018) (conditionally certifying collective where plaintiff's complaint and declaration supported that putative plaintiffs performed similar duties, did not receive overtime pay, and were not paid for all hours worked).

[76] However, if the Court finds that the evidence is not sufficient to warrant sending notice to a nationwide collective, it should authorize notice to putative collective members in the states from which Plaintiff presented evidence from: Texas (Hamm and Clark); Louisiana (Hamm and Holmes); Illinois (Casalino); Florida (Proctor); and California (Ramirez).

19

*Acadia Healthcare Co.*, No. 20-1515, 2022 U.S. Dist. LEXIS 123519 (E.D. La. July 13, 2022). The court there ordered notice sent based on the much of the same evidence submitted with this Motion, even under the far more demanding *Swales*[77] standard. *See id.*

Courts in this Circuit and many other jurisdictions also regularly order notice sent in cases involving similar meal break and rounding policies, including: *Gray v. Delta Cnty. Mem. Hosp. Dist.*, No. 19-cv-02938-RBJ, 2021 U.S. Dist. LEXIS 70642, at *15 (D. Colo. Mar. 1, 2021); *Thompson v. Menorah Park Ctr. for Senior Living*, No. 1:17CV2580, 2021 U.S. Dist. LEXIS 21127, at *2 (N.D. Ohio Feb. 4, 2021); *Hunter v. Legacy Health*, No. 3:18-cv-02219-AC, 2021 U.S. Dist. LEXIS 371 (D. Or. Jan. 4, 2021) (notice sent to nationwide group of non-exempt nurses, CNAs, and nursing aides based on allegations the healthcare system requires patient care workers to remain on-duty for unpaid meal periods); *Miller v. Jackson*, No. 3:10-1078, 2011 U.S. Dist. LEXIS 60594 (M.D. Tenn. June 6, 2011); *Fritz v. Corizon Health*, No. 19-CV-03365-SRB, 2020 U.S. Dist. LEXIS 219474 (W.D. Mo. Nov. 23, 2020*); Ruffolo v. LaSalle Grp.*, Inc., No. 18 C 3305, 2019 U.S. Dist. LEXIS 31980, at *18 (N.D. Ill. Feb. 28, 2019) (granting nationwide notice over similar meal break for patient-care employees in claims assisted living facilities as "[a]n FLSA action does not need named plaintiffs from each of the defendant employer's many offices nationwide to merit" notice.); *Straka v. Methodist Dallas Medical Center Auxiliary*, No. 3:16-CV-2192-B, 2018 WL 1611865 (N.D. Tex. Apr. 3, 2018).

This is not an exhaustive list of cases demonstrating the propriety of Court-ordered notice. These and other similar decisions show that notice is warranted where, like here, the plaintiff

---

[77] *Swales* directs courts to "rigorously scrutinize the realm of 'similarly situated' workers . . . from the outset of the case" to ensure that the "requested opt-in notice will go to those who are actually similar to the named plaintiffs." *Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 434 (5th Cir. 2021). Thus, after *Swales*, the question courts must answer when deciding whether to certify a collective action is the same question asked at the previous the decertification stage: whether evidence shows that the proposed collective is similarly situated such that collective trial is appropriate and fair. *Kibodeaux v. A&D Interests, Inc.*, 579 F. Supp. 3d 896, 907 (S.D. Tex. 2022).

demonstrates a strong likelihood that she and others might be similarly situated. Plaintiff has done that. This Motion should be granted, and notice should be sent.

J.    <u>Plaintiff's Court-Authorized Notice Plan is Fair, Accurate, and Should Be Approved.</u>

The Court should authorize notice to be sent to all non-exempt hourly patient care workers who worked at an Acadia facilities anywhere in the United States at any time from July 21, 2018 through the present. A collective action depends on such notice to ensure "employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Hoffman-La Roche*, 493 U.S. at 170. Plaintiff's proposed notice plan does just that. The Court should therefore (a) approve Plaintiff's proposed notice and consent forms as they are timely, accurate, and informative; (b) order the notice and consent form sent via First Class Mail, email, and text message by a third-party administrator.; (c) order the notice and consent forms to be posted at Acadia's facilities nationwide; (d) authorize Plaintiff to send reminder notices.

    i.   *Plaintiff's proposed notice is timely, accurate, and informative.*

Plaintiff requests the Court approve the proposed Notice and Consent forms, attached as **Exhibit 14.** The proposed notice is timely, accurate, and informative. The Notice neutrally explains the case, informs putative Collective members of their right to opt-in, advises that the Court has not decided the merits of the case, and further advises that Acadia cannot retaliate for participating in the case.

    ii.   *The proposed notice and consent form should be sent via First Class Mail, email, and text message by a third-party administrator.*

The notice documents should be sent via First Class Mail and email to all current and former patient care workers who worked at an Acadia facility[78] from July 21, 2018 through the

---

[78] While Plaintiff requests "nationwide" notice, this excludes River Place Behavioral Health, in Laplace, Louisiana.

present. First Class Mail and email notice are common forms and are routinely granted by courts in the Sixth Circuit and across the country. *See Crosby*, 348 F. Supp. 3d at 751-52 (citing *Evans v. Caregivers, Inc.*, No. 3:17-cv-0402, 2017 WL 2212977, at *7 (M.D. Tenn. May 19, 2017); *Williams v. King Bee Delivery, LLC*, No. 5:15-cv-306, 2017 WL 987452, at *7 (E.D. Ky. Mar. 14, 2017).

This Court likewise found email notice reasonable. *McGill*, 2020 U.S. Dist. LEXIS 187064, at *12. Email notice furthers the broad remedial purpose of the FLSA. It is a useful and cost-effective means to facilitate notice. *Brittmon v. Upreach, LLC*, 285 F. Supp. 3d 1033, 1044 (S.D. Ohio 2018) ("Allowing dual notice [by mail and email] 'advances the remedial purpose of the FLSA, because service of the notice by two separate methods increases the likelihood that all potential opt-in plaintiffs will receive notice of the lawsuit, and of their opportunity to participate.'" (citing *Williams*, 2017 WL 987452, at *7)).

There are also several reasons why text notice is appropriate. As one court explained:

> Unlike e-mail, text messages, at the very least, have eyes laid on them before being opened or ignored. And while one's e-mail account is quickly becoming inseparable from their cell phone—that is to say, most people own a smartphone on which they receive text messages and e-mails—a short vacation or busy workweek can result in literally hundreds of unread e-mails. The same cannot be said about text messages; people keep up with them. Maybe it is because texting is not as associated with work-related activities. Or maybe it is because texting is quickly becoming (if it has not already become) our primary method of communicating with friends and family. Whatever the reason, there is no denying that potential plaintiffs are more likely to receive notice of the collective action if a court allows text-message notice, in addition to e-mail and mail.

*Thrower v. UniversalPegasus, Int'l Inc.*, 484 F. Supp. 3d 473, 490 (S.D. Tex. 2020); *accord Regan v. City of Hanahan*, 2017 WL 1386334, at *3 (D.S.C. Apr. 17, 2017). Thus, because the purposes of the notice process is to inform similarly situated individuals of their rights, text notice should be approved. Plaintiff further requests that putative collective members be permitted to execute

22

their consent forms online through an electronic signature service by clicking on a link or typing their names into a given field in a manner verified and overseen by the notice administrator. Users' consent forms are then instantaneously sent to the notice administrator. Importantly, this would merely be an option for signing the consent forms, not the only method.

Given the potential size of the putative collective members, Plaintiff requests the Court authorize the hiring of a neutral third-party administrator to administer the notice. All putative collective members interested in joining the lawsuit would be required to return their respective consent forms to the notice administrator within ninety (90) days of the initial mailing.[79]

iii. *The notice and consent forms should be posted at Acadia's facilities nationwide.*

Plaintiff also proposes the Notice be posted in plain view at each of Acadia's facilities, in the common areas, nationwide. Courts in the Sixth Circuit, and in this District, require employers to post the notice at a conspicuous location. *See Crosby*, 348 F. Supp. 3d at 751 (citing Evans, 2017 WL 2212977, at *7; *Jowers v. NPC Int'l, Inc.*, No. 13-1036, 2016 WL 7238963, at *8 (W.D. Tenn. Dec. 13, 2016); *Brown v. Consol. Rest. Operations, Inc.*, No. 3:12-00788, 2013 WL 4804780, at *7 (M.D. Tenn. Sept. 6, 2013)). This posted notice serves two purposes. First, it ensures Acadia's current employees that Acadia cannot retaliate against them for participating. Second, it guarantees that current employees receive notice of this action. For these reasons, this request should be granted.

---

[79] Courts in this Circuit regularly approve 90-day notice periods. *See, e.g., Fenley v. Wood Grp. Mustang, Inc.*, 170 F. Supp. 3d 1063, 1075-76 (S.D. Ohio 2016); *Atkinson v. TeleTech Holdings, Inc.*, No. 3:14-CV-253, 2015 U.S. Dist. LEXIS 23630, 2015 WL 853234, at *1 (S.D. Ohio Feb. 26, 2015); *Sisson v. OhioHealth Corp.*, No. 2:13-CV-517, 2013 U.S. Dist. LEXIS 162464, 2013 WL 6049028, at *8 (S.D. Ohio Nov. 14, 2013); *Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 181 (S.D. Ohio 2012); *Musarra v. Digital Dish, Inc.*, No. C2-05-545, 2008 U.S. Dist. LEXIS 110003, 2008 WL 818692, at *7 (S.D. Ohio Mar. 24, 2008).

####### iv. *Reminder notices should be sent to putative collective members.*

Plaintiff also requests permission to send a reminder notice by postcard and email forty-five (45) days after the initial notice mailing. Such reminder notice helps ensure that all persons who are interested in joining the collective action are given ample opportunity to do so. *See Kidd v. Mathis Tire & Auto Servs., Inc.*, No. 2:14-cv-02298-JPM, 2014 WL 4923004, at *3 (W.D. Tenn. Sept. 18, 2014).

####### v. *Courts routinely require production of the names and personal contact information for the notice process*

To effectuate this notice, Plaintiff requests the Court order Acadia to provide the names, last known mailing address(es), all known email addresses, phone numbers, dates of birth, dates of employment, and location(s)/facility(s) worked for all putative collective members within the relevant time period. Production of this list is a necessary to the notice process. *See Lindberg v. UHS of Lakeside, LLC*, 761 F. Supp. 2d 752, 765 (W.D. Tenn. 2011). The requested information is necessary to confirm current addresses and/or locate potential opt-in plaintiffs who may have moved or changed phone numbers. Moreover, the production of all known email addresses is particularly important because such contact information typically does not change when a person moves.

**K.** **The Court Should Equitably Toll the Putative Collective Member's Claims.**

Equitable tolling is warranted. The Court should toll the Collective's claims from the date of the filing of the original Complaint (or the filing of Plaintiff's first motion for notice) until the close of any notice period. Equitable tolling of an opt-in plaintiff's FLSA claims is particularly appropriate where "delays during the collective-action certification process constitute 'extraordinary circumstances' beyond plaintiffs' control." *Kutzback v. LMS Intellibound*, LLC, 233 F.Supp.3d 623, 631 (W.D. Tenn. 2017); *see also Hoffman v. Kohler Co.*, No. 2:15-cv-01263-STA-

24

egb, 2017 U.S. Dist. LEXIS 140766, at *22-23 (W.D. Tenn. Aug. 30, 2017) (tolling putative collective members statute of limitations.)

In *Clark*, Judges Bush and White concurred, noting that that district courts should consider tolling putative collective member's claims when ordering notice. They explained that this newly "heightened standard" and "its concomitant discovery and requirement to litigate defenses [] may significantly lengthen the period before potential plaintiffs are notified of a pending FLSA lawsuit" resulting in "many potential plaintiffs" not learning "of the FLSA action until after the limitations period for some or all of their claims has run." *Clark*, 68 F.4th at 1012.

Here, equitable tolling is warranted given the extraordinary delays in this litigation. For example, Plaintiff fully briefed a prior motion for conditional certification, which was then denied without prejudice to refile as the Sixth Circuit issued Clark after Plaintiff filed her Motion.[80] The Court also did not issue a scheduling order for **almost 9 months**, during which time discovery was closed and Plaintiff was unable to prosecute this case. Defendants also wasted the Court's time and the Parties' resources by engaging in improper and obstructionist discovery tactics,[81] unilaterally ending a party deposition due to counsel's travel plans[82] and filing an erroneous sanctions motion.[83] Likewise, the motion practice[84] in this case has caused considerable delay. These circumstances render tolling appropriate. *See Archer v. Nabors Truck Serv.*, No. 16-cv-02610-JTF-tmp, 2018 U.S. Dist. LEXIS 221008, at *23 (W.D. Tenn. Oct. 12, 2018); *Penley v. NPC Int'l, Inc.*, 206 F. Supp. 3d 1341, 1351 (W.D. Tenn. 2016) ("[T]he Plaintiffs' claims will be tolled as of the date that the first motion for conditional certification could have been fully briefed under the scheduling order

---

[80] (ECF No. 76).
[81] (ECF No. 103) and (ECF No. 110). For these same reasons, Plaintiff should be allowed to refile this Motion if her Motion to Modify Case Management Order (ECF No. 110) is granted.
[82] *See* Acadia Dep. at 243:10-12.
[83] *See* (ECF No. 32) and (ECF No. 44).
[84] *See, e.g.*, Motion to Dismiss (ECF No. 22) and Motion for Sanctions (ECF No. 33).

in place at the time[.]"); *Thompson v. Direct Gen. Consumer Prods., Inc.*, No. 3:12-cv-1093, 2014

U.S. Dist. LEXIS 28912, 2014 WL 884494, at *8 (M.D. Tenn. Mar. 5, 2014).

## IV. CONCLUSION

Plaintiff has demonstrated a "strong likelihood" that she and the putative FLSA collective

are sufficiently similarly situated for court-authorized notice to issue. The Court should thus grant

this Motion.

Respectfully submitted,

Dated: October 21, 2024

*/s/ Robert E. Morelli, III*

David W. Garrison (TN Bar No. 24968)
Joshua A. Frank (TN Bar No. 33294)
BARRETT JOHNSTON
**MARTIN & GARRISON, LLC**
Philips Plaza
414 Union Street, Suite 900
Nashville, Tennessee 37219
Tel: (615) 244-2202; Fax: (615) 252-3798
dgarrison@barrettjohnston.com
jfrank@barrettjohnston.com

Carolyn H. Cottrell (*Pro Hac Vice*)
Ori Edelstein (*Pro Hac Vice*)
Robert E. Morelli, III (TN Bar No. 037004)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel: (415) 421-7100; Fax: (415) 421-7105
ccottrell@schneiderwallace.com
oedelstein@schneiderwallace.com
rmorelli@ schneiderwallace.com

*Counsel for Plaintiff, Class, and Collective
Members*

26

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed a copy of the foregoing Local Rule 7.01(c) Motion on October 4, 2024, and served a copy to all parties of record by operation of the Court's CM/ECF electronic filing system. I further certify that I served a true and correct copy of the foregoing on Defendants' known counsel of record via email per the parties' Electronic Service Agreement and pursuant to Fed. R. Civ. Proc. Section 5(b)(2)(E), as follows:

Mark W. Peters
Frederick L. Conrad III
Flynne M. Dowdy
Annie Bailey
Renee Boswell-Stangel
**HOLLAND & KNIGHT LLP**
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
andrew.naylor@hklaw.com
markwpeters@hklaw.com
trip.conrad@hklaw.com
flynne.dowdy@hklaw.com
annie.bailey@hklaw.com
renee.boswell@hklaw.com
*Counsel for Defendants*

*/s/ Robert E. Morelli, III*